SETH P. WAXMAN (*pro hac vice* pending)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice* pending)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice* pending)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

***Attorneys for Plaintiff***
**TWITTER, INC.**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWITTER, INC., <br><br>        Plaintiff, <br><br>        v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; KEVIN K. MCALEENAN, in his official capacity as Acting Commissioner, U.S. Customs and Border Protection; STEPHEN P. CARUSO, in his official capacity as Special Agent In Charge, U.S. Customs and Border Protection; and ADAM HOFFMAN, in his official capacity as Special Agent, U.S. Customs and Border Protection, <br><br>        Defendants. | Case No. _____ |

## COMPLAINT

Plaintiff Twitter, Inc. ("Twitter"), by and through its attorneys, hereby alleges:

### INTRODUCTION

1.     This is an action to prevent the U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), and the individual Defendants from unlawfully abusing a limited-purpose investigatory tool to try to unmask the real identity of one or more persons who have been using Twitter's social media platform, and specifically a Twitter account

named @ALT_USCIS, to express public criticism of the Department and the current Administration. The rights of free speech afforded Twitter's users and Twitter itself under the First Amendment of the U.S. Constitution include a right to disseminate such anonymous or pseudonymous political speech. In these circumstances, Defendants may not compel Twitter to disclose information regarding the real identities of these users without first demonstrating that some criminal or civil offense has been committed, that unmasking the users' identity is the least restrictive means for investigating that offense, that the demand for this information is not motivated by a desire to suppress free speech, and that the interests of pursuing that investigation outweigh the important First Amendment rights of Twitter and its users. But Defendants have not come close to making any of those showings. And even if Defendants could otherwise demonstrate an appropriate basis for impairing the First Amendment interests of Twitter and its users, they certainly may not do so using the particular investigatory tool employed here—which Congress authorized solely to ensure compliance with federal laws concerning imported merchandise—because it is apparent that whatever investigation Defendants are conducting here does not pertain to imported merchandise.

2.     In the days and weeks following the inauguration of President Donald J. Trump, a new and innovative class of American speakers emerged on Twitter's ubiquitous online platform: speakers who purport to be current or former employees of federal agencies, or others with special insights about the agencies, who provide views and commentary that is often vigorously opposed, resistant, or "alternative" to the official actions and policies of the new Administration. Typically, these so-called "alternative agency" accounts are named and self-described by their users in a manner that both (a) identifies the particular federal agency that the user seeks primarily to criticize and with which the user purports to have significant knowledge, and (b) proclaims that the user is not an official voice or spokesperson for the agency. Examples of these accounts include @alt_labor, which purports to provide informed but unofficial commentary on the U.S. Department Labor, and @blm_alt, which does the same for the federal Bureau of Land Management. Dozens of such accounts have sprung up, and many of them are actively used to disseminate criticism of the Administration and its policies. Many of these

accounts have attracted large audiences of other Twitter users ("followers"), often numbering in the tens of thousands or more.

3.      Like many Twitter users, those who speak through these "alternative agency" accounts do so pseudonymously, often going to considerable lengths to avoid disclosing their real identities.  The motivations these users have for preserving their anonymity presumably include a desire to speak freely and without the fear of negative consequences that may flow from being identified as the source of controversial views and commentary concerning the Administration and its agencies.  Such fears are likely to be especially great for users of "alternative agency" accounts who are currently employed by the very agency that is a principal target of the commentary, in light of the retaliation, harassment, or even loss of livelihood that might occur if their real identities became known to their superiors.

4.      One such "alternative agency" account is @ALT_USCIS.  Like other accounts of this sort, @ALT_USCIS claims to be run by one or more current government employees—in this case, employees of the United States Citizenship and Immigration Services ("USCIS"), a unit within the Defendant DHS.  And as with other such accounts, the person or persons who established and speak through @ALT_USCIS have identified themselves only by means of this pseudonymous account name.  To the best of Twitter's knowledge, they have not disclosed their real identities in any of their public communications through this account.

5.      In the just over two months since it was created, @ALT_USCIS has frequently criticized the immigration policies of the new Administration, highlighted what the user views as a history of waste and mismanagement within USCIS and DHS, and publicized facts that the account's users portray as casting doubt on Administration policies.

6.      The Defendants are now threatening the anonymity of the person(s) speaking through the @ALT_USCIS account.  Specifically, on March 14, 2017, they issued and delivered to Twitter an administrative summons (the "CBP Summons") demanding that Twitter provide them records that would unmask, or likely lead to unmasking, the identity of the person(s) responsible for the @ALT_USCIS account.  The summons was issued by a Special Agent in

Charge within U.S. Customs and Border Protection, another unit of DHS.  The CBP Summons is unlawful and must be enjoined for two reasons.

7.      *First*, the sole statutory authority CBP invoked in issuing the summons—19 U.S.C. § 1509—authorizes the agency to compel production of only a narrow class of records relating to the importation of merchandise.  But CBP's investigation of the @ALT_USCIS account plainly has nothing whatsoever to do with the importation of merchandise into the United States.  Section 1509 thus provides CBP no power to compel Twitter to reveal information pertaining to the identity of the individual(s) behind the @ALT_USCIS account.

8.      *Second*, permitting CBP to pierce the pseudonym of the @ALT_USCIS account would have a grave chilling effect on the speech of that account in particular and on the many other "alternative agency" accounts that have been created to voice dissent to government policies.  The Supreme Court has long recognized the extraordinary value of the kind of speech emanating from these accounts—pure political speech criticizing government policies and highlighting government waste and mismanagement.  And the Court has likewise recognized that anonymity is often essential to fostering such political speech where, as here, the speaker could face retaliation or retribution if his or her real identity were linked to the speech.  In this context, the CBP Summons must be declared unlawful and enjoined absent an evidentiary showing by Defendants that some criminal or civil offense has been committed, that unmasking the users' identity is the least restrictive means for investigating that offense, that the demand for this information is not motivated by a desire to suppress free speech, and that the interests of pursuing that investigation outweigh the important free speech rights of Twitter and its users.  Defendants have not even attempted to meet that burden.

9.      For these and other reasons discussed below, Twitter respectfully requests that this Court declare the summons unlawful and enjoin its enforcement.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the First Amendment to the U.S. Constitution, the Administrative Procedure Act ("APA"), the Tariff Act of 1930, as amended, and other Federal statutes.

11.     This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 and the APA, 5 U.S.C. § 706.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and each Defendant is an officer or agency of the United States sued in his or its official capacity.

## PARTIES

13.     Twitter is a Delaware corporation with its principal place of business at 1355 Market Street, San Francisco, CA 94103.  Twitter operates a global platform for self-expression and communication, with the mission of giving everyone the power to create and share ideas and information instantly.  Twitter's more than 300 million active monthly users use the platform to connect with others, express ideas, and discover new information.  Hundreds of millions of short messages (known as "Tweets") are posted on Twitter every day.  Twitter provides these services at no charge to its users.

14.     The U.S. Department of Homeland Security is a cabinet department of the United States federal government.  Its stated missions include antiterrorism, border security, immigrations and customs, and disaster prevention and management.

15.     The U.S. Customs and Border Protection is an agency within DHS.  It is responsible for managing and controlling the border of the United States, including with respect to import customs, immigration, border security, and agricultural protection.

16.     John F. Kelly is the Secretary of DHS.  He is sued in his official capacity.

17.     Kevin K. McAleenan is the Acting Commissioner of CBP.  He is sued in his official capacity.

18.     Stephen P. Caruso is a special agent in charge within CBP.  He is sued in his official capacity.

19.     Adam Hoffman is a special agent within the Office of Professional Responsibility of CBP.  He is sued in his official capacity.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL BACKGROUND

<u>The Emergence And Popularity Of "Alternative Agency" Accounts On The Twitter Platform</u>

20.     President Donald J. Trump was inaugurated on January 20, 2017.  That day the official Twitter account of the National Park Service retweeted an image comparing the crowd size at President Trump's inauguration to the apparently larger crowd size at President Obama's 2009 inauguration.

21.     As the public began to remark on the agency's retweet, the National Park Service abruptly shut down its own account and sent an internal email to agency employees explaining that "[a]ll bureaus and the department have been directed by [the] incoming administration to shut down Twitter platforms immediately until further notice."  And President Trump called the acting director of the National Park Service to complain about the agency retweeting an unflattering comparison of his inaugural crowd size.  The day after the inauguration, the Park Service reactivated its official account and Tweeted an apology for "the mistaken [retweets] from our account yesterday."[1]

22.     Four days after the inauguration, on January 24, 2017, the official Twitter account for Badlands National Park began to Tweet a series of statements about climate change from the @BadlandsNPS account.



---

[1] Lisa Rein, *Interior Department Reactivates Twitter Accounts After Shutdown Following Inauguration*, WASH. POST (Jan. 21, 2017), https://www.washingtonpost.com/news/powerpost /wp/2017/01/20/interior-department-banned-from-twitter-after-retweet-of-smaller-than-usual-trump-inauguration-crowd/?utm_term=.4e6d99996772.

Complaint

23.     Press reports described the @BadlandsNPS account as having gone "rogue," and the National Park Service explained that a former employee who still had access to the @BadlandsNPS account had been responsible for the Tweets.  The Park Service quickly removed the unauthorized Tweets and blocked the former employee's access.

24.     Shortly thereafter, a new wave of Twitter accounts began to appear on the Twitter platform:  self-identified as expressing "alternative" ideas, views, and information about a particular federal agency.  Although seemingly inspired by the National Park Service's inauguration day Tweet or by the short-lived takeover of the @BadlandsNPS account, these new alternative agency accounts were not "official" accounts of any government agency.  Instead, they operated under names such as @blm_alt, @alt_labor, and @RogueEPAstaff.  Within weeks, dozens of such accounts had been created, many attracting tens of thousands of followers or more.  In some cases, multiple alternative agency accounts appeared for a single agency.

25.     While some of these alternative agency accounts appear to be run by former federal employees or activists with no connection to the government, many of the accounts claim, through their user-created account descriptions or the content of their Tweets, to be administered by individuals who are currently employed by the federal agency after which the account is named.

26.     These self-designated alternative agency accounts have tended to challenge views of the Administration and its policies, often (but not always) focusing on the policies of the particular agency for which the account was named.  The styles of expression emanating from these accounts vary greatly.

27.     Some accounts appear to equate the simple act of broadcasting facts as an expression of dissent.





28.     The accounts often have expressed disagreement with specific policies of the official agency.



29.     One of the many Tweets from the @alt_labor account publicized a letter signed by 600 current and former Labor Department employees opposing the confirmation of the President's nominee for Labor Secretary, Andrew Puzder.



30.     Like many online platforms, Twitter's platform offers users the choice between speaking in a self-identifying manner (for example, by selecting a user name that matches or is similar to the user's real name) or pseudonymously (through an account that has a user name and user description that do not disclose the speaker's real identity).

31.     Pseudonymity of the speaker(s) is a defining feature of the alternative agency accounts that have recently emerged on the Twitter platform.  While the persons who establish and use these accounts sometimes provide highly general descriptions of themselves (for example, by stating in the account's biography that the user or users work or previously worked for a particular agency), they typically refrain from revealing their real names.  The users appear to view and depend on preservation of their anonymity as crucial to their ability to express information and ideas that are contrary to the policies and objectives of the Administration and its agencies.  Preserving anonymity appears to be especially important for users of these alternative agency accounts who are current federal employees, given the risk that such users could face retaliation, sanctions, or other negative repercussions from their federal employer if they were identified as the source of criticism of their agency.[2]

---

[2] Alleen Brown, *Rogue Twitter Accounts Fight To Preserve The Voice Of Government Science*, THE INTERCEPT (Mar. 11, 2017), https://theintercept.com/2017/03/11/rogue-twitter-accounts-fight-to-preserve-the-voice-of-government-science (reporting that several "alternative agency" accounts are administered by current agency employees and that those employees wish to

Complaint

The @ALT_USCIS Twitter Account

32.     This case concerns one particular alternative agency account that, like many others, was created in late January 2017:  @ALT_USCIS.

33.     As of the time Twitter received the CBP Summons, the public, user-provided description of the @ALT_USCIS account described its user or users as "[o]fficial inside resistance."  As of then and now, the account description prominently declares that the account is "[n]ot [expressing] the views of DHS or USCIS."  The account's profile image plays off USCIS's official logo (displayed side-by-side below), further indicating a correspondence or relationship to the agency, albeit one that is unofficial, ideologically or politically averse, and/or "rogue."[3]  Tweets from this account use hashtags such as "#altgov," expressly self-identifying as part of the broader alternative agency movement.

    

34.     On several occasions, Tweets from the @ALT_USCIS account have claimed that the person speaking through the account is a current federal employee of the United States Citizenship and Immigration Services (USCIS), an entity that reportedly has 19,000 employees and contractors.  But beyond purporting to identify his or her employer, the person(s) using the account have chosen to remain pseudonymous.

35.     In two months of existence, the @ALT_USCIS account has attracted over 32,000 followers and has issued thousands of Tweets.

---

preserve their anonymity "out of fear of workplace retaliation and pressure to shut down their accounts").

[3] The accountholder reworked the account's description and profile image at some point after Twitter received the CBP Summons.  The profile image displayed above is as it was when the summons was received.

36.     The @ALT_USCIS account has expressed dissent in a range of different ways. One of the account's first Tweets asserted a fact about illegal immigration in the United States that the author apparently believed cast doubt on the Administration's immigration policy.

 



Fact: more than 40% of illegal aliens in the US are Visa overstays from other developed countries not sounding like MEXICO. #TheResistance

RETWEETS 12     LIKES 18

6:06 PM - 26 Jan 2017

37.     The @ALT_USCIS account has often criticized immigration policies with which the speaker apparently disagrees.  The account was created on nearly the same day that the President issued his original immigration Executive Order.  Tweets from the account have repeatedly criticized the Order—often referring to it as the "#MuslimBan."  Other Tweets have taken aim at the President's proposal to build a wall along the U.S.-Mexico border.  For example, on March 11, 2017, the account used news that a fence-jumper had trespassed onto the White House grounds to argue that the Administration's proposed border fence will be ineffective.

 



I1/4 mile long wall/fence heavily guarded with secret service, sensors and cameras can be jumped over.Mexico wall will be just as effective

RETWEETS 70     LIKES 187

9:18 AM - 11 Mar 2017

10     70     187

38.     Tweets from the @ALT_USCIS account have also purported to shine a light on historical and recent mismanagement at USCIS.  For example, on March 12—two days before issuance of the CBP Summons challenged in this suit—a series of Tweets from the account

1    decried what the author described as waste, inefficiency, and poor management in the agency's

2    attempts to set up a new automated system for processing immigration applications.



16        39.    The account has regularly leveled criticism at U.S. Customs and Border

17   Protection—the agency that issued the summons challenged by this lawsuit.



27        40.    The account has also frequently tweeted disagreement with the current

28   Administration's policies on subjects other than immigration—expressing opposition to efforts in

Complaint

1  Congress to repeal the Affordable Care Act and urging Democrats to resist confirmation of

2  Supreme Court nominee Neil Gorsuch, among many other issues.

3          41.     Occasionally, the account has highlighted USCIS or DHS policies that the speaker

4  appears to support.  For example, the day DHS Secretary Kelly announced that the Department

5  would continue to exempt from removal individuals covered by the prior Administration's

6  Deferred Action for Childhood Arrivals policy (DACA), the account issued the following Tweet.



U.S. Customs And Border Protection Orders Twitter To Produce
Records That Would Strip The @ALT_USCIS Account Of Anonymity

          42.     On March 14, 2017, Defendant Adam Hoffman, an agent within U.S. Customs

and Border Protection, transmitted to Twitter by fax a summons, ordering Twitter to produce

certain records pertaining to the @ALT_USCIS account.  The CBP Summons invoked as

authority 19 U.S.C. § 1509.  It was signed by Defendant Stephen P. Caruso, a CBP Special

Agent in Charge based in Miramar, Florida.  A true and accurate copy of the CBP Summons, in

the form it was received by Twitter, is attached as Exhibit A.

          43.     The CBP Summons states that Twitter is "required" to "produce[] for inspection"

"[a]ll records regarding the [T]witter account @ALT_USCIS to include, User names, account

login, phone numbers, mailing addresses, and I.P. addresses."  The purpose of this request

appears to be, and the effect of Twitter's complying with it likely would be, to enable or help to

enable Defendants to pierce the anonymity of the person or persons who established and use the

@ALT_USCIS account.

44.     The CBP Summons warned Twitter that "[f]ailure to comply with this summons will render you liable to proceedings in a U.S. District Court to enforce compliance with this summons as well as other sanctions."

45.     The CBP Summons ordered Twitter to produce the records to a CBP office in Washington D.C. by 11:45 A.M. on March 13, 2017—the day *before* the CBP Summons was faxed to Twitter.

46.     The CBP Summons states generically that "production of the indicated records is required in connection with an investigation or inquiry to ascertain the correctness of entries, to determine the liability for duties, taxes, fines, penalties, or forfeitures, and/or to ensure compliance with the laws or regulations administered by CBP and ICE."  Beyond that boilerplate language, the CBP Summons provides no justification for issuance of a summons targeting the @ALT_USCIS account.

47.     The CBP Summons further "requested"—but did not order or otherwise compel— Twitter "not to disclose the existence of this summons for an indefinite period of time."

48.     Notwithstanding the request on the face of the CBP Summons that Twitter not disclose the existence of the CBP Summons to anyone, a "Summons Notice" included in the CBP Summons describes a procedure whereby the subject of the summons (i.e., the person whose "business transactions or affairs" are purportedly being investigated) supposedly could "object to the examination" of the requested records by "advis[ing] the person summoned [i.e. Twitter], in writing, not to comply with the summons" and "send[ing] a copy of that notice by registered or certified mail to the CBP Officer … who issued the summons."  To be effective, any such objection would have to be sent "not later than the" deadline set by the CBP Summons for compliance—which, again, had already passed by the time the CBP Summons was served on Twitter.  Neither the CBP Summons itself, nor the statute that supposedly authorizes issuance of the summons (*i.e.*, 19 U.S.C. § 1509), nor the regulations implementing that statute describe any procedure for Twitter to object to compliance with the summons.

49.     On March 28, 2017, counsel for Twitter contacted Defendant Hoffman to raise concerns regarding the request not to provide notice to the user and the legal basis for seeking

1   information about the identified account using a summons issued under 19 U.S.C. § 1509.

2   Defendant Hoffman advised counsel for Twitter that CBP did not want the user notified and that

3   he would discuss notice with his supervisors.  With regard to the legal basis for the summons,

4   Defendant Hoffman stated vaguely that he is conducting an investigation.  But he did not identify

5   any law or laws that he believed had been broken or point to any evidence substantiating any

6   such belief—such as particular Tweets that he believes were unlawful.  Defendant Hoffman took

7   the position that the summons was an appropriate investigative tool, but he did not provide any

8   specifics as to how a summons issued under 19 U.S.C. § 1509 could be an appropriate means for

9   CBP's Office of Professional Responsibility to be conducting this particular investigation.  In

10  fact, to the limited extent he did explain the nature of the investigation, it seemed to confirm that

11  the investigation had nothing to do with obtaining records to assess whether appropriate duties

12  and taxes had been paid on imported merchandise.

13          50.     Twitter advised Defendant Hoffman that, unless he or his agency obtained a court

14  order under the federal Stored Communications Act, 18 U.S.C. § 2705, directing Twitter not to

15  disclose the CBP Summons to the @ALT_USCIS accountholder(s), Twitter would, in

16  accordance with its standard practices, notify the accountholder(s) of the existence and content of

17  the CBP Summons.  On March 31, 2017, Defendant Hoffman sent Twitter an email confirming

18  that no such court order would be obtained.  On April 2, 2017, Twitter stated in a response to

19  Defendant Hoffman that it intended to notify the accountholder(s) the next day about the CBP

20  Summons.

21          51.     On April 4, 2017, Twitter notified the @ALT_USCIS accountholder(s) about the

22  existence and contents of the CBP Summons.  At approximately the same time, Twitter also

23  informed Defendant Hoffman of its intention to challenge the CBP Summons in court if it was

24  not withdrawn within 48 hours.  Later that day, counsel for Twitter sent Defendant Hoffman an

25  email elaborating the bases for Twitter's legal objections to the CBP Summons—namely that the

26  summons falls outside the statutory parameters of 19 U.S.C. § 1509 and infringes on the First

27  Amendment rights of Twitter's users and Twitter itself—and reiterating Twitter's intention to

28  sue absent withdrawal of the summons.

52.     As of today's date, Defendants have not notified Twitter of any intent to withdraw the CBP Summons.

### COUNT I
**(19 U.S.C. § 1509; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; APA, 5 U.S.C. § 706)**

### THE SUMMONS EXCEEDS THE SCOPE OF CBP'S AUTHORITY UNDER 19 U.S.C. § 1509

53.     Plaintiff hereby incorporates by reference paragraphs 1-52 as if set forth fully herein.

54.     The summons is unlawful because it demands production of records that CBP is not authorized to obtain under 19 U.S.C. § 1509.

55.     The summons exceeds the scope of CBP's authority under 19 U.S.C. § 1509 for two reasons.  *First*, 19 U.S.C. § 1509 authorizes CBP to obtain documents only for investigations and inquiries relating to the importation of merchandise.  *Second*, even if CBP issued the summons for a proper purpose, the summons seeks production of records that are not of the narrowly limited type that CBP is authorized to obtain under 19 U.S.C. § 1509.  These two reasons are explained more fully below.

56.     *First*, 19 U.S.C. § 1509 confers authority on the Secretary (or a delegate at or above the rank of district director or special agent in charge) to compel disclosure of records only in connection with "any investigation or inquiry conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service."  19 U.S.C. § 1509(a).  The first three items on the list clearly relate narrowly to imports, and the meaning of the fourth term is "cabin[ed]" by the first three.  *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (applying "the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995))).

57.     Defendants could not plausibly establish that they issued the CBP Summons—which demands "[a]ll records regarding the [T]witter account @ALT_USCIS to include User names, account login, phone numbers, mailing addresses, and I.P. addresses"—in any investigation or inquiry relating to the import of merchandise.

58.     *Second*, § 1509 does not authorize the Defendants to compel production of the account-related records that the summons demands.  The Secretary or his delegate can compel the production of only records that fall within a narrow category defined in 15 U.S.C. § 1509(d)(1)(A).  *See* 15 U.S.C. § 1509(a)(2)(D) ("[T]he Secretary ... may … summon … any … person he may deem proper … to produce records, *as defined in subsection (d)(1)(A)*.").

59.     Subsection 1509(d)(1)(A) limits the "records" whose production may be permissibly compelled through a summons to those (1) that are "required to be kept under section 1508 of this title" and (2) "regarding which there is probable cause to believe that they pertain to merchandise the importation of which into the United States is prohibited."  The records that the CBP Summons demands Twitter to disclose meet neither of these criteria.

60.     Section 1508 requires importers to maintain certain records relating to their activity of importing merchandise.  *See United States v. Frowein*, 727 F.2d 227, 233 (2d Cir. 1984) ("Section 1508 … imposes recordkeeping requirements on those who import or cause goods to be imported.").  Specifically, the entities that must maintain records under section 1508 are limited to the following: any "owner, importer, consignee, importer of record, entry filer, or other party who—(A) imports merchandise into the customs territory of the United States, files a drawback claim, or transports or stores merchandise carried or held under bond, or (B) knowingly causes the importation or transportation or storage of merchandise carried or held under bond into or from the customs territory of the United States," 19 U.S.C. § 1508(a)(1); *or* any "agent of any party described in paragraph (1)," *id.* § 1508(a)(2); *or* any "person whose activities require the filing of a declaration of entry, or both," *id.* § 1508(a)(3).  The records Section 1508 requires these entities to maintain are limited to records that both "pertain to any such activity, or to the information contained in the records required by this chapter in

1  connection with any such activity" and "are normally kept in the ordinary course of business." 19

2  U.S.C. § 1508(a)(3).

3  61.  Subsection 1509(d)(1)(A)(ii) likewise limits the scope of records whose

4  production CBP may compel pursuant to a summons to records relating to the importation of

5  merchandise—specifically, records "pertain[ing] to *merchandise the importation of which into*

6  *the United States is prohibited.*"

7  62.  The CBP Summons plainly does not request records relating to the importation of

8  merchandise.  It requests that Twitter produce information that pertains to the identity of the

9  person(s) who established and use the @ALT_USCIS account.  And it is utterly implausible that

10  Defendants' interest in the person(s) who established and use the @ALT_USCIS account stems

11  from their importation of merchandise into the United States.

12  63.  The CBP Summons also violates the Stored Communications Act ("SCA"),

13  18 U.S.C. § 2701 *et seq.*, which "protects individuals' privacy and proprietary interests,"

14  "reflect[ing] Congress's judgment that users have a legitimate interest in the confidentiality of

15  communications in electronic storage at a communications facility."  *Theofel v. Farey-Jones*, 359

16  F.3d 1066, 1072 (9th Cir. 2003).  The SCA establishes legal processes that government agencies

17  must follow in order to obtain certain types of information from a service provider such as

18  Twitter, which have not been followed here.  The basic subscriber information the CBP

19  Summons seeks—such as the user's name and address—can be obtained "us[ing] an

20  administrative subpoena authorized by a Federal or State statute."  18 U.S.C. § 2703(c)(2).  But

21  the CBP Summons is not a valid administrative subpoena because, among other defects, it

22  exceeds the scope of CBP's authority under 19 U.S.C. § 1509.

23  64.  For the foregoing reasons, the Court should enjoin Defendants from taking any

24  further action to enforce the CBP Summons and declare it to be an unlawful exercise of

25  Defendants' authority, in contravention of 15 U.S.C. § 1509 and the SCA.  Such relief is

26  warranted under, among other laws, the APA because issuance, service, and enforcement of the

27  subpoena is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or

28  limitations."  5 U.S.C. § 706(2)(A), (C).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**
**(U.S. Const. amend. I; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202;**
**APA, 5 U.S.C. § 706)**

**THE FIRST AMENDMENT BARS THE CBP SUMMONS ABSENT SATISFACTION**
**OF THE STRINGENT STANDARD FOR UNMASKING ANONYMOUS SPEAKERS**

65.     Plaintiff herein incorporates by reference paragraphs 1-64 as if set forth fully herein.

66.     Twitter provides a platform for speech for hundreds of millions of users.  Its users Tweet about a broad range of topics, from a favorite sports team to the birth of a child to the latest executive order.  Many of Twitter's users choose to express themselves on the platform pseudonymously.

67.     The CBP Summons seeks to force Twitter to disclose information that would identify, or likely lead to the identification of, a person (or group of persons) who has chosen to criticize the government pseudonymously and whose speech is potentially valuable since the person—as a self-described public employee—may be in the best position to "know what ails the agenc[y] for which [he or she] work[s]."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066-1067 (9th Cir. 2013) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994)).

68.     Compelled disclosure of the identities of Twitter users who have engaged in pseudonymous speech would chill their exercise of the constitutionally protected right to speak anonymously.  Moreover, independent of its users' rights, Twitter's actions in providing a platform for the dissemination of its users' speech—including its decision to permit the publication of pseudonymous speech—is fully protected by the First Amendment.  *See, e.g.*, *Marcus v. Search Warrants*, 367 U.S. 717, 731-732 (1961); *cf., e.g.*, *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).  When rights of free speech—especially anonymous free speech—are at stake, courts generally permit an organization or business to assert those rights on behalf of its members or customers.  *See, e.g.*, *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-393 (1988) (permitting booksellers to assert First Amendment rights of buyers of adult-oriented books); *Publius v. Boyer-Vine*, 2017 WL 772146,

at *5 n.5 (E.D. Cal. Feb. 27, 2017) (collecting cases holding that entities such as websites can assert the First Amendment rights of their anonymous users).

69.     The decision to speak anonymously or pseudonymously is protected by the First Amendment.  As the Supreme Court has explained, "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995).  "Anonymity is a shield from the tyranny of the majority.  It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society."  *Id.* at 357.

70.     A time-honored tradition of pseudonymous free speech on matters of public moment runs deep in the political life of America.  "Undoubtedly the most famous pieces of American political advocacy are *The Federalist Papers*, penned by James Madison, Alexander Hamilton, and John Jay, but published under the pseudonym 'Publius.'"  *In re Anonymous Online Speakers*, 661 F.3d 1168, 1172-73 (9th Cir. 2011) (citing *McIntyre*, 514 U.S. at 344 n.6).

71.     The decision to maintain anonymity "may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."  *Watchtower Bible and Tract Soc'y of New York, Inc. v. Village of Stratton*, 122 S. Ct. 2080, 2089-90 (2002) (internal citation omitted).  In the present case, there is reason for concern that the CBP Summons itself may reflect the very sort of official retaliation that can result from speech that criticizes government officials and agencies.  Because of the potential for retaliation and ostracism, "[t]here can be no doubt that [requiring identification of pseudonymous authors] would tend to restrict freedom to distribute information and thereby freedom of expression."  *Talley v. California*, 362 U.S. 60, 64-65 (1960); *see also (WIN) Washington Initiatives Now v. Rippie*, 213 F.3d 1132, 1139 (9th Cir. 2000) ("Depriving individuals of … anonymity is … 'a broad intrusion, discouraging truthful, accurate speech by those unwilling to [disclose their identities] and applying regardless of the character or strength of an individual's interest in anonymity.'") (quoting *American Constitutional Law Found., Inc. v.*

1    *Meyer*, 120 F.3d 1092, 1103 (10th Cir. 1997))); *see also Am. Civil Liberties Union of Nevada v.*

2    *Heller*, 378 F.3d 979, 988 (9th Cir. 2004).

3         72.    These First Amendment interests are at their zenith when, as here, the speech at

4    issue touches on matters of public political life.  Political expression "occupies the core of the

5    protection afforded by the First Amendment" and must be afforded the highest level of First

6    Amendment protection.  *McIntyre*, 514 U.S. at 346; *see also Mills v. Alabama*, 384 U.S. 214,

7    218 (1966) ("[T]here is practically universal agreement that a major purpose of that Amendment

8    was to protect the free discussion of governmental affairs."); *New York Times Co. v. Sullivan*,

9    376 U.S. 254, 270 (1964) (a case should be considered "against the background of a profound

10   national commitment to the principle that debate on public issues should be uninhibited, robust,

11   and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly

12   sharp attacks on government and public officials.").

13        73.    These protections for anonymous and pseudonymous political speech are as

14   robust on the Internet as any other mode of speech.  The Supreme Court has unequivocally held

15   that speech on the Internet is entitled to the highest form of First Amendment protection.  *See*

16   *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  As the Supreme Court aptly recognized, through the

17   Internet and interactive services such as Twitter, "any person with a phone line can become a

18   town crier with a voice that resonates farther than it could from any soapbox.  Through the use of

19   Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer."

20   *Id.*; *see also In re Anonymous Online Speakers*, 661 F.3d at 1173 ("Although the Internet is the

21   latest platform for anonymous speech, online speech stands on the same footing as other

22   speech.").  "As with other forms of expression, the ability to speak anonymously on the Internet

23   promotes the robust exchange of ideas and allows individuals to express themselves freely

24   without 'fear of economic or official retaliation ... [or] concern about social ostracism.'"  *In re*

25   *Anonymous Online Speakers*, 661 F.3d at 1173 (quoting *McIntyre*, 514 U.S. at 341-342).

26        74.    Compelling Twitter to disclose information that would identify or lead to the

27   identification of the person(s) who established and use the @ALT_USCIS account would chill

28   the expression of particularly valuable political speech—namely speech by current or former

1    public employees, or others with special insight into operations of our government.  The

2    Constitution does not permit a government agency to suppress dissent voiced by current or

3    former employees in their private capacity—especially when such efforts exceed the agency's

4    statutory authority.  "[C]itizens do not surrender their First Amendment rights by accepting

5    public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014).  Indeed, "[t]here is a

6    significant First Amendment interest in encouraging public employees, who have special access

7    to facts relevant to debates on issues of public concern, to speak freely and make that

8    information available." *Johnson v. Multnomah Cty., Or.*, 48 F.3d 420, 424 (9th Cir. 1995).

9    "[S]peech by public employees on subject matter related to their employment holds special value

10   precisely because those employees gain knowledge of matters of public concern through their

11   employment." *Franks*, 134 S. Ct. at 2378-2381.  "It may often be the case that, unless public

12   employees are willing to blow the whistle, government corruption and abuse would persist

13   undetected and undeterred." *Dahlia*, 735 F.3d at 1066-1067.  "The interest at stake is as much

14   the public's interest in receiving informed opinion as it is the employee's own right to

15   disseminate it." *San Diego v. Roe*, 543 U.S. 77, 82 (2004).

16           75.     In light of the compelling First Amendment interests at stake, Defendants must

17   satisfy "stringent standards" before using a subpoena or other compulsory legal process to

18   attempt to unmask the identity of the person(s) who established and use the @ALT_USCIS

19   account. *Mason Awtry v. Glassdoor, Inc.*, 2016 WL 1275566, at *1 (N.D. Cal. Apr. 1, 2016)*;

20   see In re Anonymous Online Speakers*, 661 F.3d at 1778 ("[T]he nature of the speech should be a

21   driving force in choosing a standard by which to balance the rights of anonymous speakers"

22   against the interests of those seeking disclosure, with political speech warranting "imposition of

23   a heightened standard").  In particular, Defendants must demonstrate that (1) "there is a real

24   evidentiary basis for believing" that some criminal or civil offense has been committed,

25   *Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 975-976 (N.D. Cal. 2005);

26   (2) revealing the identity of the speaker(s) is "necessary"—that is, that it is the least restrictive

27   means for investigating that offense, *Glassdoor, Inc*, 2016 WL 1275566, at *16; *Art of Living

28   Foundation v. Does 1-10*, 2011 WL 5444622, *10 (N.D. Cal. Nov. 9, 2011); (3) Defendants'

1    demand for this information is not motivated by a desire to suppress free speech; and (4) the

2    interests of pursuing that investigation outweigh the important First Amendment rights of Twitter

3    and its users, *Highfields*, 385 F. Supp. 2d at 975-976.  *See also Doe No. 1 v. Cahill*, 884 A.2d

4    451 (Del. 2005) (preventing disclosure of identity of anonymous online speaker); *Dendrite*

5    *Intern., Inc. v. Doe No. 3*, 775 A.2d 756 (N.J. Super. 2001) (same).  The heightened showing

6    required for such compulsory legal process is not only supported by substantial judicial

7    precedent, but also is consistent with the special procedures erected in other contexts to protect

8    First Amendment rights.  *E.g.*, *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1182-1183 (9th

9    Cir. 2013) (California's anti-SLAPP statute "establish[es] a summary-judgment-like procedure

10   available at an early stage of [a] litigation that poses a potential chilling effect on speech-related

11   activities" (internal quotation omitted)); 28 C.F.R. § 50.10(c)(1) (requiring subordinates in the

12   Department of Justice to obtain the authorization of the Attorney General to issue a subpoena to

13   a member of the news media, or to use a subpoena to obtain from a third party communications

14   records or business records of a member of the news media).

15         76.    Defendants have satisfied none of these requirements.  To meet the first

16   requirement, Defendants must "adduce *competent evidence*" that "address[es] *all* of the

17   inferences of fact that [Defendants] would need to prove in order to [substantiate] at least one of

18   the" offenses that Defendants believe has been committed.  *Highfields Capital Mgmt., L.P.*, 385

19   F. Supp. at 975.  Defendants have fallen far short of this standard, given that they have neither

20   specified any offense they are purportedly investigating nor presented *any* evidence in support of

21   any element of any such offense.

22         77.    Defendants have likewise failed to demonstrate that unmasking the identity of the

23   @ALT_USCIS accountholder(s) is the least restrictive way to investigate any offense or offenses

24   that they believe were committed.  To establish that the CBP Summons is "necessary,"

25   Defendants must explain why other investigatory tools they have deployed have fallen short,

26   leaving Defendants with no choice but to pierce @ALT_USCIS's pseudonymity.  *E.g.*,

27   *Glassdoor, Inc*, 2016 WL 1275566, at *16; *Art of Living Foundation*, 2011 WL 5444622, at *10.

28   Defendants have not come close to making that showing.

78.     Defendants' failure to establish that some offense within the law enforcement purview of CBP was actually committed and that the CBP Summons is necessary to investigate that offense likewise confirms that Defendants have failed to demonstrate that the summons is not motivated by a desire to suppress free speech, or that Defendants' need to unmask the identity of the @ALT_USCIS accountholder(s) outweighs the harm that doing so would cause to the First Amendment rights of Twitter and its users.

79.     For the foregoing reasons, the Court should enjoin Defendants from taking any further action to enforce the CBP Summons and—absent the requisite showing—declare it to be a violation of the rights of Twitter and its users under the First Amendment.  Such relief is warranted under, among other laws, the APA, because issuance, service, and enforcement of the CBP Summons is "contrary to constitutional right."  5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.      Declare that the CBP Summons is unlawful and unenforceable because Defendants issued it for reasons not authorized by 19 U.S.C. § 1509 and because it demands production of documents that Defendants are not authorized to demand or obtain under 19 U.S.C. § 1509, and further declare that the CBP Summons violates the Administrative Procedure Act as not in accordance with law, 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

b.      Declare that the CBP Summons is unlawful and unenforceable because it violates the First Amendment rights of both Twitter and its users by seeking to unmask the identity of one or more anonymous Twitter users voicing criticism of the government on matters of public concern without Defendants having satisfied the stringent standards for piercing a speaker's anonymity, and further declare that the CBP Summons violates the Administrative Procedure Act as "contrary to constitutional right," 5 U.S.C. § 706(2)(B);

c.      Issue an order vacating and nullifying the CBP Summons, enjoining Defendants or their agents from enforcing the CBP Summons, and declaring that Twitter has no obligation to comply with the CBP Summons;

Complaint

d.      Award Plaintiff its costs and reasonable attorney's fees as appropriate; and

e.      Grant such other relief as this Court may deem just and proper.

Dated:  April 6, 2017                    Respectfully submitted,

/s/ Mark D. Flanagan
SETH P. WAXMAN (*pro hac vice* pending)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice* pending)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice* pending)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

*Counsel for Plaintiff Twitter, Inc.*